(54 App. Div. 205.)

### CASSIDY v. UHLMANN et al.

(Supreme Court, Appellate Division, First Department. November 9, 1900.)

1. BANK DIRECTORS — FRAUDULENTLY RECEIVING DEPOSITS — SUFFICIENCY OF EVIDENCE.

A bank director, for a week preceding its failure, was at the bank during business hours, and in the evening with other directors, and caused a statement of its affairs to be made. On examination of such statement he became aware of the bank's insolvency, and, after a discussion of the propriety of receiving deposits in view of the insolvency, agreed on such course. *Held* sufficient to warrant a finding that when certain deposits were received just prior to the bank's failure such director knew of the insolvency, and actually took part in directing their receipt.

2. SAME—EVIDENCE—RES GESTÆ.

In an action to charge a bank director with individual liability for receiving deposits knowing the bank to be insolvent, that such director was present with other directors after it had been decided to close the bank, and as a result of such meeting certain depositors were permitted to withdraw their deposits, not in the ordinary course of business, is admissible as res gestæ to.show the intent with which such deposits were received.

Ingraham, J., dissenting.

Appeal from trial term.

Action by Martin Cassidy against Frederick Uhlmann, impleaded with others. From a judgment in favor of plaintiff, and from an order denying his motion for a new trial, defendant Frederick Uhlmann appeals. Affirmed.

Argued before VAN BRUNT, P. J., and HATCH, RUMSEY, McLAUGHLIN, and INGRAHAM, JJ.

William A. Jenner, for appellant.
Harold Nathan, for respondent.

RUMSEY, J. The plaintiff, as assignee of several persons who made deposits in the Madison Square Bank on the 7th and 8th of August, 1893, sued the defendants, who were directors of the bank, for fraudulently receiving deposits at a time when they knew that the bank was hopelessly insolvent. The appellant, Uhlmann, alone defended. He gave no evidence upon the trial, and the case stood upon the evidence offered by the plaintiff. There was no dispute that the deposits were made by the plaintiff's assignors, as alleged in the complaint. Neither was there any dispute that at that time the bank was insolvent. The court submitted to the jury two questions: First. "Did the defendant know, at the time the several deposits in question were taken by the bank, that the bank was insolvent?" Secondly. "Did the defendant take part in directing the receipt of the deposits by the bank knowing that it was insolvent?" Each of these questions the jury answered in the affirmative. The amount of the deposits was not disputed, and the jury rendered a general verdict for that amount, which was $6,491.86. A motion for a new trial was denied. Judgment was entered upon the verdict, and from the order and the judgment thus entered this appeal is taken.

The learned counsel for the appellant insists that the defendant Uhlmann, being a director, only, of the bank, and not an officer engaged in its active management, stood in no such relation to a depositor as would enable that depositor to charge him with fraud because the deposits were received by the bank at a time when it was insolvent. It is not necessary, in deciding this case, to consider at any length the duties and responsibilities of a director of a bank who takes no part in its active management, and is not acquainted with its condition. Whatever may be the extent of the responsibility of such a director in respect of the business of a bank, Mr. Uhlmann did not stand in that position. The evidence showed without any dispute that at a very early day of the month of August Mr. Uhlmann took steps to actually acquaint himself with the situation and condition of the bank, and the jury have found not only that he had become aware, at the time these deposits were made, that the bank was insolvent, but that he actually took part in directing the receipt of these deposits. These findings were warranted by the evidence. The testimony was that these deposits were taken to the bank on Monday and Tuesday, the 7th and 8th of August, 1893. The evidence is undisputed that during the week preceding Mr. Uhlmann was at the bank not only during business hours, but during the evenings, with other directors; that he caused a statement of its affairs to be prepared, and that after an examination of this statement several days before the deposits were taken by the bank he became aware of its insolvency. It was also shown that the question of receiving deposits was discussed between the directors, one of whom was the defendant Uhlmann. It appeared that directions were given to the cashier as to the custody of deposits taken on Monday; that for a time deposits were disposed of according to these directions, but that during the day a message was sent to the cashier to receive deposits in the usual manner,

and that the deposits which had been previously taken were turned into the general assets of the bank, which had not been done until the message was delivered; and from that time until the bank finally closed its doors on Tuesday deposits were received in the usual way in which solvent banks receive the deposits of their customers. That all this was done, and express directions were given to receive the deposits on Monday, was known to the defendant, and this course was agreed upon by him after a discussion of the propriety of receiving deposits in view of the insolvency of the bank. Whether he directed that the deposits made on Monday should be turned into the general assets of the bank, or whether he knew that such directions were given, does not appear, nor is it, in our judgment, important. He did know that the bank was insolvent. He must necessarily have known that all deposits made after that condition was discovered were received in fraud of the persons making them; and if, for any reason, he directed that deposits should be accepted in a qualified way, so that the depositors should be protected, he was bound to see that the deposits thus received were kept in the manner in which the employés of the bank had been directed to keep them. It does not lie in his mouth, after the receipt of these deposits, to say that he did not pay sufficient attention to the business after that time to continue to the depositors the protection which it is said the qualified receipt would have given to them.

It is said that this mode of receiving the deposits was justified by a decision of the court of appeals. 57 N. E. 620. Whether this was so is of no importance, because that course of business was not continued, and the deposits were received in the usual manner on Monday afternoon and on Tuesday, and those received before that time were turned into the general assets of the bank. As has been found by the jury, the defendant took part in the receiving of the deposits after the insolvency of the bank was known. Therefore he is to be judged in the same way that any officer of a bank is, who, knowing its condition, and knowing it to be insolvent, causes its business to be continued. This is not the case of a director who, after deposits have been received by an insolvent bank without his knowledge either of the receipt of the deposits or the insolvency of the bank, seeks to shelter himself from responsibility on the ground that he is unaware of its condition, but that of a person in authority, who, knowing of the condition of the bank, and knowing of its insolvency, takes upon himself after that time to give express directions that the deposits shall be received. Such an act is by statute made a misdemeanor (Pen. Code, § 601), and the court of appeals has held that a banker with knowledge that his bank is insolvent cannot honestly continue in business, and accept the money of his customers; and, though he does so without any actual intent to defraud, he will be held to have that intent if he continues to receive deposits under those circumstances. Anonymous, 67 N. Y. 598; Craigie v. Hadley, 99 N. Y. 131, 1 N. E. 539. If it were necessary to determine here as an original question whether the appellant was responsible for the receipt of these deposits under the cir-

cumstances, the cases just cited would be sufficient to establish that responsibility; but the question is not an original one in this court. It has been determined in an action brought by this plaintiff against this defendant upon the same cause of action, where it was held that the receipt of the deposits under the circumstances disclosed in this case was fraudulent as against the depositors, and they were entitled to recover the amount of their deposits against him. Cassidy v. Uhlmann, 27 App. Div. 80, 50 N. Y. Supp. 318. It is quite true that that case was reversed in the court of appeals, but the reversal was solely upon a question of evidence, which is not presented here; and nothing was said in the opinion of the court of appeals to disapprove the rule of law there laid down upon the general proposition.

There remain simply the questions of evidence which are presented upon this appeal. All were presented upon the trial of the case of Cassidy v. Uhlmann, 27 App. Div. 80, 50 N. Y. Supp. 318, and were there disposed of against the contention of the appellant. The determination of these questions there made was correct. The bank closed its doors on the afternoon of the 8th of August, 1893, and was not again opened for business. On the evening of that day a meeting of several of the directors, among whom was the defendant, was held at the office of the bank. The state treasurer, who had deposited a large amount of money in the bank, was also present. The East River Bridge Company, of which the appellant was president, was also a depositor to the amount of $50,000. Another corporation, in which a brother of the appellant was an officer, had a deposit of $5,000 in the bank. The plaintiff proved that on Tuesday evening, after that meeting, checks were drawn by the state treasurer for the amount of the state moneys in the bank, by the East River Bridge Company and by the Glenn Ridge Mining & Quarry Company, the company of which the appellant's brother was an officer, for the amount of their respective deposits, and that these checks were presented and paid through the clearing house the next day, although, in the usual course of business, such presentation could not have been made before August 10th. This evidence was received under the objection and exception of the defendant's counsel, and it is now insisted that the court erred in admitting the testimony of these withdrawals. It appeared that the state treasurer was called into the meeting of the directors on Tuesday night, and it also appeared that after that meeting—and the jury might have assumed as a result of it—these several checks were drawn. The question is whether the appellant, in receiving deposits on the 7th or 8th of August, was guilty of a fraudulent act towards the depositors whose money had been paid in during those days. Any act from which it might be inferred that the appellant had an intent to defraud those depositors was clearly competent. The appellant knew on Saturday that the bank was insolvent, yet with that knowledge he permitted deposits to be received on Monday and Tuesday. In the evening, after it had been determined to close the doors of the bank, he was present at a meeting with other directors, and, as a result of that consultation, favored depositors, one of them the com

pany of which he was president, and another a corporation in which his brother was interested, were permitted to withdraw large amounts of money, not in the ordinary course of business. The effect of this was largely to diminish the amount upon which the depositors could rely for the repayment of the moneys they had put into the bank during the two days before, and to that extent it operated to injure them. This act of the appellant might properly be shown to characterize the intent with which the deposits were received on Monday and Tuesday. Certainly, if he had taken that money to pay his own debt from the bank, every one would assent that it was cogent evidence tending to show the intent with which the deposits had been received during the previous two days. That the debt was not his own, but belonged to corporations in which he or members of his family were interested, while it may diminish the weight of the evidence, does not take away its competency. It was clearly, we think, a part of the res gestæ, and the jury might be permitted to refer to it as giving some light upon the intent with which the deposits were received. So, even if the question had not been determined by this court in Cassidy v. Uhlmann, 27 App. Div. 80, 50 N. Y. Supp. 318, we would hold that the evidence was competent. We have examined the other points raised by the appellant and find no error in the rulings.

The judgment and order must therefore be affirmed, with costs to the respondent. All concur, except INGRAHAM, J., who dissents.

INGRAHAM, J. I do not concur in the affirmance of this judgment, as I do not think that the evidence sustains the finding of the jury that the defendant took part in directing the receipt of the deposit for the bank knowing that it was insolvent. This action is based upon fraud in receiving the money of the plaintiff on deposit in the Madison Square Bank when the bank was insolvent. To prove any cause of action against this appellant, he must be proved guilty of the fraud. It is well settled that where a banking corporation receives deposits from its customers when it is insolvent, and known to be insolvent, a fraud is committed, which justifies the customer in repudiating the transaction, and recovering back from the corporation the money or securities so deposited; but this action is not against the bank, or to recover possession of the property acquired by the fraud, but is to hold the appellant, a director of the bank, personally responsible to the depositors for the amount of the deposit that the plaintiff and his assignors deposited with this insolvent bank after its insolvency became known to its officers. It is not claimed that this appellant made any statement or representation to the plaintiff, or to any one else, as to the solvency of the bank, which induced these deposits; nor was the appellant one of the executive officers of the bank who received the deposits. He was one of the directors of the bank. He had nothing to do with the receipts of the deposits, nor did he know that the deposits were made; and there is no evidence that when these deposits were actually made he knew, or had reason to suppose,

that the bank was in immediate danger of being compelled to suspend its business. There is evidence tending to show that on the day before these deposits were made he saw a statement of the condition of the bank, which indicated a considerable impairment of its capital, and there are expressions that he used in looking over this statement that would indicate he had doubts about the bank's solvency. This was on Saturday, August 5, 1893. On the Monday morning following, the appellant, Uhlmann, and two other directors of the bank, one of whom was its customer, were present, and had a talk about the bank's receiving deposits. It was stated that it would not be right for the bank to take deposits, owing to the showing made by the statements, at which time McDonald, who was one of the directors present, told Thompson, who was the cashier, "to take deposits on Monday by this method: That if a person owed the bank any money, and the amount that he owed the bank was in excess of his deposit then standing to his credit, that the amount should be entered on his pass book. If it was less, why just give him a duplicate ticket, and hold the book; and, in case the depositor didn't owe the bank any money, to give him a duplicate deposit ticket, and hold the book on any pretext,—for balancing, or whatever it might be." Uhlmann does not seem to have taken part in giving this direction. He had stated that he did not think the bank should receive deposits, and was present, and without objection heard another director give his opinion to the cashier, who was also a director, as to what should be done as to deposits under the circumstances; and this is all the connection that Uhlmann had with the management or control of the bank in accepting deposits on Monday and Tuesday. On Monday the deposits seem to have been received under this suggestion of McDonald, and such deposits were put upon one side, and not added to the general assets of the bank; but subsequently, on Monday afternoon, "word was received from downtown," after which time the deposits were entered on the books of the bank, and checks and cash were put through,—were made a part of the assets of the bank. On the evening of Monday, August 7, 1893, Uhlmann was present at the bank, with his attorney. No meeting of the board of directors was held, and no official action was taken by the board of directors in regard to continuing business. There is no evidence that the defendant interfered at all with the management of the bank, or that he knew that the arrangement about the receipt of deposits suggested by McDonald to the cashier on Monday morning had not been carried out; and this is the only evidence that the appellant interfered in any way in the management of the bank, or made himself responsible for the receipt of deposits after it was ascertained that the bank was insolvent. There is no evidence to show that this appellant could have in any way procured a meeting of the board of directors, or caused any official action which would have resulted in the bank's closing its doors. He was not one of the executive officers of the bank charged with the management of its affairs from day to day, had no authority, as a director, to take the affairs of the bank out of the hands of its

president and cashier. The prevailing opinion seems to place the ground of his liability upon the proposition that "if, for any reason, he directed that deposits should be accepted in a qualified way, so that the depositors should be protected, he was bound to see that the deposits thus received were kept in the manner in which the employés of the bank had been directed to keep them"; and it is from that proposition that I dissent. He, as an individual director, was no more bound to see that the employés obeyed the directions which had been given to them in this respect than in any other. If he had heard the cashier of the bank directed not to certify checks of a particular customer, could he have been held liable because the cashier had disobeyed that instruction, or could it have been said that he was bound to stand by the cashier to see that the instructions were obeyed? I think there is a plain distinction between the obligation resting upon a director of a bank and its executive officers, president or cashier, and, that to hold a director of a bank liable to a customer of the bank for fraud committed by its executive officers, there must be proof of some declaration or act of the director connecting him with the transaction, by which he has made himself a party to it, and responsible for its consequences. That a fraud was committed when this bank received these deposits on Monday and Tuesday prior to its failure, and that the officers of the banking corporation who were directly responsible for the receipt of these moneys, and who received them knowing the bank to be insolvent, may be liable to the depositors for the fraud may be conceded. That a director of the bank, however, is so liable without proof of a direct participation in the receipt of the deposits, or proof of some official act by which the bank was kept open after its insolvency had been ascertained, I do not believe. McDonald and Uhlmann, the two directors present at the time the suggestion as to the receipt of these deposits was made, had no authority to close the bank. As individuals they had no authority to control its management. They had no power to enforce a direction that was given, and it was quite evident that the executive officers of the bank refused to recognize their authority, and overruled their advice. Upon what principle it can be said that they were responsible because the executive officers refused to take their advice, and conduct the business as they thought, in honesty and fair dealing, it should be conducted, I am unable to see. Uhlmann had no more power to see to it that his recommendation was carried out than he had to close the doors of the bank and prohibit them from receiving deposits. He certainly cannot be said to have authorized the receipt of deposits under any other system than that advised on Monday morning, and it seems to me that the plaintiff has lost the money because Uhlmann's efforts to restrict the business of the bank in such a way that no fraud could be committed were unsuccessful. This decision certainly extends the liability of the directors of a corporation much further than it has ever been extended before, imposing upon an individual director responsibility for the acts of the executive officers of a corporation over whom he had no individual control, and makes him liable for

acts of the executive officers of the bank which he has no power to prevent.

I also think that the evidence as to the withdrawals by the state treasurer and by the East River Bridge Company upon Tuesday evening, after it had been determined that the bank had to suspend, was incompetent as against the appellant, and was calculated to and did seriously injure him with the jury. Certainly, the action of the state treasurer in withdrawing this money on Tuesday night could have no possible relation to an act of the appellant on Saturday and Monday in keeping the bank open. The withdrawal of the state deposits was not instigated by the appellant, and could have had no possible relevancy upon this issue.

I think the judgment should be reversed.

